**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| NATIONAL LEGAL AND POLICY CENTER, PETER T. FLAHERTY and JAMES "JAMIE" R. TOVAR, | |
| Plaintiffs, | Case No. 8:24-CV-162 |
| + | |
| vs. | |
| BERKSHIRE HATHAWAY, INC., WARREN BUFFETT, JOHN DOE 1, and JOHN DOE 2, | |
| Defendants. | |

**BRIEF OPPOSING DEFENDANTS' MOTION TO DISMISS**
**PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ ii

**I.    STATEMENT OF THE CASE** ................................................................................. 1

**II.    LEGAL STANDARD** .............................................................................................. 6

**III.    ARGUMENT** ........................................................................................................... 6

   **a.    Plaintiffs Sufficiently Plead Facts Showing Mr. Buffett and Berkshire are Plausibly Liable on All Counts.** ................................................................................................................ 6

   **b.    Plaintiffs' Claims are Plausible on Their Face and Do Not Fail as a Matter of Law.** ......... 9

      i.    Count I (Assault) for Plaintiff Peter T. Flaherty against Defendants are sufficiently pled. ………………………………………………………………………………………12

      ii.    Sufficient facts are pled by Mr. Flaherty supporting Count II (Battery). ...................... 16

      iii.    Count III (Intentional Infliction of Emotional Distress) has been sufficiently pled by Mr. Flaherty. ................................................................................................................ 17

      iv.    Mr. Flaherty has pled sufficiently for the Court to reasonably infer Defendants committed Count IV (False Imprisonment) ................................................................. 20

      v.    The assistance provided by the Omaha officer became Malicious Prosecution (Count V) when the Omaha officer acted pursuant to the plainclothes security guards' order to arrest Mr. Flaherty. ................................................................................................................ 22

      vi.    James "Jamie" Tovar also Experienced Assault (Count VI) and Battery (Count VII) by Defendants. ................................................................................................................... 25

      vii.    Mr. Tovar was also Falsely Imprisoned (Count VIII) by Defendants. ........................ 26

      viii.    Plaintiffs have pled sufficient facts supporting their claim of Promissory Estoppel (Count IX) against Defendants. ................................................................................... 27

**IV.    CONCLUSION** ...................................................................................................... 29

**CERTIFICATE OF COMPLIANCE**………………………………………………………30

**CERTIFICATE OF SERVICE**………………………………………………………… 30

i

# TABLE OF AUTHORITIES

## FEDERAL STATUTES

Fed. R. Civ. P. 8(a)(2) ......................................................................................... 6

Fed. R. Civ. P. 12(b)(6) ........................................................................................29

## CASES

*Acton v. Acton*, No. A-04-147, 2006 WL 908872 (Neb. Ct. App. Apr. 11, 2006) ...................... 23

*Barber v. State*, 316 Neb. 398, 407 (2024) ............................................................... 16, 25

*Barton v. Taber*, 820 F.3d 958, 963-64 (8th Cir. 2016).............................................. 6, 17

*Berman v. Anderson*, 226 Neb. 333, 336 (1987) ....................................................... 12

*Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 118 (2001) ...................................... 20, 22, 26

*Kenney v. Barna*, 215 Neb. 863, 865 (1983) .......................................................... 10

*Koricic v. Beverly Enterprises--Nebraska, Inc.*, 278 Neb. 713 (2009)... 7, 8, 12, 14, 15, 22, 23, 26

*Malolepszy v. Cent. Mkt.,* 143 Neb. 356 (1943) ........................................................ 10

*Page v. Siedband*, No. A-19-121, 2023 WL 7499741 (Neb. Ct. App. Nov. 14, 2023) ............... 27

*Reavis v. Slominski*, 250 Neb. 711, 717 (1996) ....................................................... 12, 25

*Richardson v. BNSF Ry. CO.*, 2 F.4th 1063, 1068 (8th Cir. 2021)................................. 17

*Sayed v. Associated Bank, N.A.*, 779 F.3d 727, 730 (8th Cir. 2015) ............................... 6

*Schieffer v. Cath. Archdiocese of Omaha*, 244 Neb. 715 (1993).................................... 17

*State v. Goering*, No. A-93-1128, 1994 WL 585763 at *5 (Neb. Ct. App. Oct. 25, 1994) ......... 21

*State v. McCave*, 282 Neb. 500 (2011) ................................................................. 10

*State v. Rothenberger*, 294 Neb. 810 (2016) ........................................................... 14, 20, 26

*State v. Wollam*, 280 Neb. 43 (2010) .................................................................. 18, 21

*Weitz Co., LLC v. Hands, Inc.*, 294 Neb. 215, 226 (2016) ........................................... 27

*Young v. Eriksen Const. Co.*, 250 Neb. 798, 802 (1996) ............................................................. 10

**OTHER AUTHORITIES**

Omaha Mun. Code § 20-154 ........................................................................................................ 10

Omaha Mun. Code § 20-155 ........................................................................................................ 10

Khadeeja Safdar, "*Bill Gates, Leon Black, Thomas Pritzker: One Day in the Life of Jeffrey Epstein,*" Wall St. J. (May 4, 2023) ……………………………………………………………… 24

# I.    STATEMENT OF THE CASE

Plaintiff National Legal and Policy Center ("NLPC") is a 501(c)(3) nonprofit organization under the Internal Revenue Code, granted tax-exempt status in 1993, with its principal place of business based in Virginia. (Filing 1, ¶¶ 4 and 10). NLPC is the sponsor of the Corporate Integrity Project, through which it exposes corruption in public companies, and addresses corporate governance and policy issues through shareholder activism. (Filing 1, ¶ 10). NLPC has engaged in shareholder activism since 2004. (Filing 1, ¶ 11).  In 2023, NLPC filed 26 shareholder proposals on a variety of topics, including proposals for an independent chair in 2023, at Bank of America, Coca-Cola, Goldman Sachs, Home Depot, Mondelez, PepsiCo, Salesforce, and Visa. *Id*.

Plaintiff, Peter Flaherty, a resident of Virginia, is Chairman of NLPC and has personally delivered prepared remarks supporting NLPC's proposals at various shareholder meetings, and spoke at Berkshire Hathaway's 2022 and 2023 Shareholders' meeting. (Filing 1, ¶¶ 5, 12-14, 21-27). Mr. Flaherty's assistant is James "Jamie" R. Tovar, a resident of Virginia, who also attended the 2023 Shareholders' meeting with Mr. Flaherty. (Filing 1, ¶¶ 6, 12-14, 21-27).

On October 18, 2022, Paul Chesser, Director of NLPC's Corporate Integrity Project, submitted a shareholder proposal to Berkshire titled "Request for Board of Directors to Adopt Policy for Independent Chair." (Filing 1, ¶ 13). NLPC's cover letter included the SEC-required information about NLPC's availability to discuss the proposal with Berkshire, should it wish to do so. *Id*. At no time did Berkshire contact NLPC about having such informal engagement. *Id*.

NLPC was the proponent of a similar proposal for an independent chair at Berkshire's 2022 Shareholders' meeting. (Filing 1, ¶ 14).  Mr. Flaherty spoke at the 2022 Shareholders' meeting in support of the independent chair for more than five minutes without incident, and said proposal received support from diverse shareholders, including a public endorsement by the California

Public Employees' Retirement System (CalPERS). *Id*. The proposal received the vote of 10.67%
of the outstanding shares, thereby qualifying it for reconsideration in 2023. *Id*. The renewed
proposal and supporting statement were published in Berkshire's proxy dated March 17, 2023, as
Proposal No. 8.5. (Filing 1, ¶ 15).  On April 21, 2023, NLPC submitted a Notice of Exempt
Solicitation in support of the proposal. *Id*. Links were published on the SEC's EDGAR website
and on Berkshire's website. *Id*. The Notice also addressed Mr. Buffett's "support for controversial
and divisive political issues" through his billion-dollar donations to the Bill and Melinda Gates
Foundation and the Susan Thompson Buffett Foundation. (Filing 1, ¶ 16). Specifically, the notice
stated:

> Another argument for an independent chair policy at Berkshire
> Hathaway is the fact that Berkshire's identity *is* Mr. Buffett, whether
> he likes it or not (we think he does). The consequence of this
> entanglement is the perception that his engagement on controversial
> issues is endorsed by Berkshire - a view that Mr. Buffett says he
> does not want.

(Filing 1, ¶ 18).

NLPC posted on its website that it had filed the Proposal and the Notice of Exempt
Solicitation on April 24, 2023, and repeated the themes in those two documents. (Filing 1, ¶ 19).
On May 1, 2023, Mr. Chesser received an email from Marc Hamburg, Berkshire's Secretary,
Senior Vice President and Chief Financial Officer, with instructions for proposal proponents for
the day of the meeting, including where to report to deliver proposal presentations. (Filing 1, ¶ 20).
The email stated, "Once you arrive at microphone zone 1, you should ask for either Dan Jaksich
or Cathy Woollums." *Id*. Ms. Woollums, Sr. Vice President and Chief sustainability officer for
Berkshire Hathaway Energy, had met with Mr. Flaherty in 2022, when she served as a liaison for
proposal proponents. *Id*. Mr. Hamburg's email also stated, "You will have three minutes to present

the proposal. However, we will be somewhat flexible as to time should you run over a minute or so." *Id*. The next day, May 2, 2023, NLPC received two credentials for Mr. Flaherty and Mr. Tovar for admittance to the meeting, via FedEx, from Berkshire. (Filing 1, ¶ 21). On May 5, 2023, the day before Berkshire's Shareholders' meeting, NLPC published on its website an advance copy of Mr. Flaherty's planned remarks for the next day, which, when read, were originally timed at four minutes and ten seconds, but which were edited to stay within the newly-imposed three-minute limit. *Id*.[1]

The Berkshire Shareholders' meeting took place on May 6, 2023, at the CHI Health Center, 455 North 10th Street, Omaha, Nebraska, at approximately 4:30 p.m. CT. (Filing 1, ¶ 22). The actual business meeting was preceded by other events, including two lengthy question-and-answer sessions with Warren Buffett and Vice-Chairman Charlie Munger, beginning at 10 a.m., with questions being asked by shareholders from the floor. *Id*. Notably, with respect to the Q&A session open to any attendee, Berkshire's Shareholders Guide on "Microphone Manners" makes clear that other than questions regarding Berkshire's investments or politics, "[a]ny other subjects are fair game." (Filing 1, ¶27).

Mr. Flaherty arrived at microphone Zone 1 shortly before 4:30 p.m. on the concourse level, as instructed, and was greeted by Ms. Woollums. (Filing 1, ¶ 23). He was accompanied by his assistant, Mr. Tovar, for the entirety of the 2023 Shareholders' meeting. *Id*. Ms. Woollums told Mr. Flaherty before he spoke that the three-minute limitation on his statement would be strictly

---

[1] Defendants falsely state that Mr. Flaherty "wanted 4 minutes and 10 seconds to state whatever was on his mind." (Filing 21, p. 21). Mr. Flaherty was prepared to deliver a three-minute statement but was stopped at the two-minute mark and arrested. What was "on his mind" was the reputational damage to the company that can flow from the controversial activities and association of its single Chairman and CEO identified as the alter ego of Berkshire. See Exhibit 3, ¶ 26.

enforced (contrary to the flexibility expressed in the earlier email) and that he should stay "on topic." *Id*.

Mr. Flaherty began to deliver his prepared remarks, which he had edited to keep within the newly-imposed three-minute limit (Exhibit 3, ¶15), and video of the event shows that 1:08 minutes in, Mr. Flaherty was approached and interrupted at the microphone by Ms. Woollums. (Filing 1, ¶ 25). Though not audible through the sound system, Ms. Woollums told Mr. Flaherty that he should stay "on topic." (Filing 1, ¶ 25). Mr. Flaherty stated into the microphone, "You are not going to censor what I say, ma'am. I'm very sorry. And I appeal to the Chair (occupied by Mr. Buffett) that I be allowed to continue. Sir?" (*Id; Exhibit 2, 278:5-7). Mr. Buffett stated, "You may continue but under the three-minute limitation." (Filing 1, ¶ 26; Exhibit 2, 278:8-10). Mr. Flaherty replied, "Of course," and resumed speaking at the 1:28 mark. (*Id*; Exhibit 2, 278:11).

At the 1:54 mark, Mr. Buffett attempted to talk over Mr. Flaherty and appeared to give directions to other persons in the hall. (*Id*; Exhibit 2, 278:15-19). This portion of Mr. Flaherty's remarks concerned Bill Gates's relationship with Jeffrey Epstein, a topic that had been recently reported in depth in the *Wall Street Journal*. *Id*. Mr. Buffett then appeared to signal that Mr. Flaherty's mic be cut. (Filing 1, ¶ 27). The mic was not silenced due to some unforeseen mechanical failure. (*Id*; Exhibit 2, 278:15-19). Despite NLPC's early submission of the proposal, and the posting on NLPC's website Mr. Flaherty's originally prepared remarks referencing Bill Gates's relationship with Jeffrey Epstein, which were likely reviewed before the meeting by Ms. Woollums and Mr. Hamburg from Berkshire, neither NLPC nor Mr. Flaherty was ever given notice that the topic of their proposal or how Mr. Flaherty can illustrate how having the same person serve as both the Chairman and CEO, was somehow inappropriate or should be limited. *Id*. At the 2:04 mark, Mr. Flaherty's mic went dead, although Mr. Flaherty did not know it at the time. *Id*.

4

At this time, Mr. Buffett and/or one or more of his or Berkshire's agents ordered that Mr. Flaherty be ejected from the hall. (Filing 1, ¶ 29). Immediately, two men, who never identified themselves but on information and belief, were plainclothes security guards Defendants John Doe 1 and John Doe 2 hired for the Shareholders' meeting by Berkshire, stood in front of Mr. Flaherty. (Filing 1, ¶ 28). These security guards told Mr. Flaherty to leave or he would be arrested. *Id*. Mr. Flaherty replied that he would leave when he finished his statement and told the one guard, "Mr. Buffett is in the chair and he will rule, not you." *Id*. He also stated that if he was not allowed to finish, he would file a Complaint with the SEC. *Id*. Mr. Flaherty was still not aware that his mic had been cut, was still well within the three-minute limitation, and had already received a favorable ruling from the chair to continue his presentation. *Id*.

One of the unidentified security guards summoned a uniformed Omaha officer who was nearby and requested that he arrest Mr. Flaherty. (Filing 1, ¶ 30).  Notably, the security guard did not in the presence of the Omaha officer request again that Mr. Flaherty leave the premises and hear him refuse to do so as is required by Omaha Police Department Policy before a person can be arrested. (Exhibit 3, ¶29). The Omaha officer immediately grabbed Mr. Flaherty by the arm, advised him that he was under arrest, and pulling him out of the arena and twisting his arm. (Exhibit 3, ¶ 30).   Mr. Flaherty told the officer to stop twisting his arm which was causing him pain and discomfort, whereupon the officer said that he would twist it more if Mr. Flaherty did not move along faster or words to that effect.  Id. Mr. Flaherty did not consent to being touched. (Filing 1, ¶ 38).

Mr. Tovar then attempted to follow Mr. Flaherty as he was removed from the arena but was physically prevented from doing so by one of the two unidentified security guards. (Filing 1, ¶ 30).  Mr. Flaherty was taken to an office within the CHI Health Center. (Filing 1, ¶ 31).  He was

issued a Ban and Bar Letter under Omaha City law, by a man who never identified himself. *Id*. (Filing 1, ¶ 59). Less than an hour later, Mr. Flaherty was transported by an Omaha officer to the Douglas County Corrections Center where he was searched, handcuffed, fingerprinted, photographed, and charged with a Request to Leave, a violation akin to criminal trespass. *Id*. In total, he was in custody for approximately three hours and was subsequently released later that evening after posting bail in the amount of $250.00. *Id*. (Filing 1, ¶ 60). The criminal proceedings against Mr. Flaherty were terminated shortly thereafter. (Filing 1, ¶ 61; Exhibit 1).

## II.    LEGAL STANDARD

A complaint must include a 'short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2); *Barton v. Taber*, 820 F.3d 958, 963-64 (8th Cir. 2016). "A complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Barton*, 820 F.3d at 963-64.  A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw reasonable inferences suggesting the defendant is liable for the misconduct alleged. *Id*. All reasonable inferences are drawn in favor of the nonmoving party. *Sayed v. Associated Bank, N.A.*, 779 F.3d 727, 730 (8th Cir. 2015). Courts may, but do not have to accept "legal conclusions or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Barton*, 820 F.3d at 963-64.

## III.    ARGUMENT

### a. Plaintiffs Sufficiently Plead Facts Showing Mr. Buffett and Berkshire are Plausibly Liable on All Counts.

Plaintiffs assert that Mr. Buffett and Berkshire are jointly and severally liable for all counts (*including* battery). Plaintiffs have pled sufficient facts establishing that an agency relationship was formed between Mr. Buffet and Berkshire, as principal, and the security guards and Omaha

officer, as agents. An agency relationship between parties is formed when both the agent and principal manifest assent for the agent to act on behalf of and subject to the principal's control. *Koricic v. Beverly Enterprises--Nebraska, Inc.*, 278 Neb. 713, 718 (2009). A principal is directly liable for acts committed by its agent(s) when such act is committed when the Agent acts on behalf of the principal, known as actual authority. *Id.* Actual authority can be either express or implied. *Id*. An agent acts under the principal's *express authority* when the agent acts pursuant to the "authority the principal expressly grants." *Id* at 717. An agent acting pursuant to a principal's *implied authority* acts "to (1) do what is necessary to accomplish the agent's express responsibilities or (2) act in a manner that the agent reasonably believes the principal wishes the agent to act, in light of the principal's objectives and manifestations." *Id* at 717-718. A principal is directly liable for any actions taken by his or her agent pursuant to actual authority, either express or implied. *Id*.

In this case, Mr. Buffett is both a principal and an agent of Berkshire. While speaking at the Shareholders' meeting, Mr. Buffett granted permission for Mr. Flaherty to continue his presentation overruling Ms. Woolums's admonition that in her subjective and arbitrary view, he should stay on topic. (Filing 1, ¶¶ 25-26; Exhibit 2, 278:5-7; Exhibit 3, ¶ 16. After Mr. Flaherty continued for another few seconds or so, Mr. Buffett attempted to interrupt Mr. Flaherty and appeared to give directions to others in the hall. (Filing 1, ¶ 26). Once the mic went dead, Mr. Flaherty was unaware it had been cut and continued to speak. Mr. Buffett ordered Mr. Flaherty be removed from the hall even though Mr. Flaherty did not hear him and continued with his presentation.  At a minimum, as a shareholder, Mr. Flaherty had the right to remain for the rest of the business meeting to hear and vote on other subsequent shareholder proposals. (Filing 1, ¶ 29; Exhibit 2, 279:3-6). Immediately after Mr. Buffett's or his agent's instructions for Mr. Flaherty to

be removed, two unidentified, plainclothes security guards approached Mr. Flaherty. (Filing 1, ¶¶ 27-28). These security guards were hired by Berkshire and thus clearly assented to act—and did act—pursuant to Mr. Buffett's orders and/or subject to Mr. Buffett's control, forming an agency relationship whether actual or apparent. *See Koricic,* 278 Neb. at 717-718.

These security guards acted under Mr. Buffett's implied actual authority and then did what they felt was necessary to accomplish the further silencing of Mr. Flaherty. These actions included: telling Mr. Flaherty to leave; threatening him that if he did not leave, he would be arrested; and directing the Omaha officer to arrest Mr. Flaherty without warning Mr. Flaherty once more in the presence of the officer to leave as required by Omaha Police Department policy. *Id*. (Filing 21, p. 9, citing Omaha Police Department Policies at 5); (Exhibit 3,¶ 29).

As a side note, Plaintiffs assert that the use of the term "apparent authority" in their Complaint was not meant to be a legal conclusion but rather a general phrase indicating that it is "clear" that the security guards were acting "under Mr. Buffett's direction." (Filing 1, ¶¶ 42, 75). However, Plaintiffs also assert that the Omaha officer acted pursuant to the security guards' apparent authority. An agent acts with *apparent authority* when "the third party's belief is traceable to the principal's manifestation and cannot be established by the agent's acts, declarations, or conduct." *See Koricic,* 278 Neb. at 720. "For apparent authority to exist, the principal must act in a way that induces a reasonable third person to believe that another person has authority to act for him or her." *Id*. Again, the exact facts will be established through discovery in this case.

Once the Omaha officer became involved, and as discussed above, did not form any independent reasonable belief to arrest Mr. Flaherty, his actions to arrest Mr. Flaherty was pursuant to the order given by the security guard. Here, the Omaha officer is a third party who believed Mr. Flaherty was being arrested because of the order or manifestations from Mr. Buffett  or his agents

8

to have Mr. Flaherty removed from the Shareholders' meeting. *Id*. Therefore, the Omaha officer was acting pursuant to the apparent authority of the security guards who, in turn, were acting as agents of Mr. Buffett and Berkshire. *Id*.

Since Mr. Buffett's manifestation that Mr. Flaherty be removed initiated the security guards' and Omaha officer's actions and provided them with implied actual and apparent authority to take such actions, he is directly liable to Plaintiffs. These facts are all pled in the Complaint and are further supported by Mr. Flaherty's Declaration (Exhibit 3) and can be reasonably inferred to suggest that Mr. Buffett and Berkshire are jointly and severally liable to: Mr. Flaherty for assault (Count I), battery (Count II), intentional infliction of emotional distress (Count III), false imprisonment (Count IV), malicious prosecution (Count V); Mr. Tovar for assault (Count VI), battery (Count VI), and false imprisonment (Count VIII); and NLPC and Mr. Flaherty for promissory estoppel (Count IX).

For all reasons stated in this section, the Complaint also sufficiently pleads that Berkshire Hathaway would be jointly and/or severally liable to Plaintiffs for all counts, especially when considering Berkshire hired the plain clothes security guards.

### b. Plaintiffs' Claims are Plausible on Their Face and Do Not Fail as a Matter of Law.

Defendants argue that Plaintiffs' claims fail as a matter of law because Mr. Flaherty "trespassed." However, Mr. Flaherty was an invitee, and despite being asked to leave by agents of Mr. Buffett, he reasonably believed he had permission to continue with his remarks after getting permission from Mr. Buffett to do so as long as he kept his remarks to three minutes, or at least if he was not allowed to continue with his remarks, to remain on the premises for the rest of the meeting as a shareholder with credentials to attend the full business meeting.

An invitee is someone who is "expressly or impliedly invited" onto the property. *Malolepszy v. Cent. Mkt.,* 143 Neb. 356, 361 (1943) (internal citations omitted). A licensee also has permission to be on the property, but "[t]he distinction between licensees and invitees rests on the purpose for which the invitation was extended." *Young v. Eriksen Const. Co.*, 250 Neb. 798, 802 (1996). If the purpose is "for the personal pleasure, convenience or benefit" of the person invited, that person is a licensee. *Erikson Const. Co.*, 250 Neb. at 802. If the invitation extended "relates to the business of the one who gives it or for the mutual advantage of a business nature for both parties," the person invited is an invitee. *Id*. On the other hand, a trespasser enters the property "without a privilege to do so." *Malolepszy,* 143 Neb. at 360 (internal citations omitted); *Kenney v. Barna*, 215 Neb. 863, 865 (1983).

An invitee may remain on the premises until asked to "leave by the owner occupant or person in control thereof, or by his agent." Omaha Mun. Code § 20-155; *see State v. McCave*, 282 Neb. 500 (2011). However, an invitee may remain if he or she reasonably believes he or she has a license (or permission) to remain on the premises. *McCave*, 282 Neb. 500 (holding where more than one person has the authority to license access to a property, a license or invitation from "any owner" creates a reasonable belief that the invitee may remain on the premises). Omaha's "Request to Leave" ordinance only applies if the "person purposely or knowingly" enters "the property of another person without being invited, licensed or privileged to do so." Omaha Mun. Code § 20-154.

Mr. Flaherty, as proxy for the National Legal and Policy Center (a shareholder in Berkshire Hathaway), was more than a mere invitee to the 2022 Berkshire Hathaway Annual Shareholders' meeting; he was required to be there and was placed on the official meeting agenda to make a presentation in support of NLPC's proposal by SEC regulations if he wanted his proposal to be

heard and voted upon by the shareholders of Berkshire. This meeting involved business for both Mr. Flaherty and Berkshire, and thus Mr. Flaherty was an invitee to the shareholders' meeting. Further proof of his invitation is illustrated by the fact that, after submission of NLPC's proposal for the meeting, Berkshire's Secretary, Senior Vice President, and Chief Financial Officer sent "instructions to proposal proponents for the day of the meeting, including where to report to deliver [the] proposal presentations." (Filing 1, ¶ 20). This email also contained instructions for presenting the proposal. (Filing 1, ¶ 20). NLPC further received two credentials for admittance to the meeting on May 2, 2023. (Filing 1, ¶ 21). Regardless of Mr. Flaherty's acknowledgment that he was asked to leave the premises, he reasonably believed he could remain on the premises to continue and finish his presentation because he was unaware his mic had been cut and received a favorable ruling from the chair to continue his presentation. (Filing 1, ¶ 28).

Notably, contrary to Defendants' assertion that Mr. Flaherty "pleads his own violation of Nebraska trespass law", (Filing 21, p. 10), he did not plead that the arresting officer "witness[ed] the person in control of the property *once more* order the trespasser to leave." (Filing 21, p. 9, citing Omaha Police Department Policies at 5) (emphasis added). See Filing 1, ¶ 30 (alleging only that the security guard summoned the officer and "requested that he arrest Mr. Flaherty"). In fact, Mr. Flaherty asserts that he was not ordered "once more" by the security guards to leave the premises in the presence of the Omaha Police officer. (Exhibit 3, ¶ 29). Any discrepancy in the facts surrounding his arrest can be resolved through discovery.

Further, trespass is a criminal charge, and Mr. Flaherty's criminal trespass charges were wisely dropped. (Exhibit 1; Filing 1, ¶ 61). He was never tried or convicted of trespass, and it is beyond any of the Defendants' authority to label or libel him as a trespasser. Thus, Mr. Flaherty's claims are sufficiently pled as a matter of law. (*See* Exhibit 1; Filing 1, ¶ 61)

i.    **Count I (Assault) for Plaintiff Peter T. Flaherty against Defendants are sufficiently pled.**

Defendants assert that a claim for assault is sufficiently pled if a plaintiff pleads "facts establishing: 1) 'an attempt [of] force' or 'threats,' 2) 'made in a menacing manner,' 3) 'with intent to inflict bodily injury upon another,' and 4) 'with present apparent ability to give effect to the attempt, without requiring that the one assaulted be subjected to any actual physical injury or contact.'" (Filing 21, p. 10 (citing *Reavis v. Slominski*, 250 Neb. 711, 717 (1996) (quoting *Berman v. Anderson*, 226 Neb. 333, 336 (1987))). Plaintiffs assert facts supporting every one of these elements, allowing the Court to draw reasonable inferences from Plaintiffs' Complaint. These reasonable inferences, when drawn in favor of the non-moving party (here, Plaintiffs), allow the Court to conclude that Mr. Flaherty has pled a claim for assault, for which a jury may find Defendants liable.

Plaintiffs assert that, "Two men, who never identified themselves, but on information and belief were plain clothes security guards […], hired by Berkshire, stood in front of Mr. Flaherty. He was told to leave or he would be arrested." (Filing 1, ¶ 28).  These security guards were acting as agents of Mr. Buffett and/or Berkshire. *See Koricic*, 278 Neb. at 718-20. Plaintiffs also claim "Mr. Buffett and/or one or more of his agents ordered that Mr. Flaherty be ejected from the hall." (Filing 1, ¶ 29). Further, "One of the unidentified men summoned a uniformed Omaha policeman who was nearby and requested that he arrest Mr. Flaherty." (Filing 1, ¶ 30). These allegations provide evidence and allow the Court to draw the reasonable inference that Mr. Flaherty was threatened with the impending use of physical force. Also, these facts are sufficient for a Court to reasonably conclude the use of the John Does and the John Does' request to the Omaha officer to arrest and eject Mr. Flaherty was meant to be menacing, satisfying another element of assault.

The Omaha officer then "grabbed Mr. Flaherty by the arm" to remove him from the hall. (Filing 1, ¶ 30). Moreover, the officer twisted Mr. Flaherty's arm which caused him pain and discomfort, and when he complained about it, the officer threatened him that he would twist it more if he did not move along faster or words to that effect.   (Exhibit 3, ¶ 30). This claim is sufficient for a Court to reasonably infer that (1) not only did the Defendants have the intent to inflict bodily harm, but (2) they did inflict harm on Plaintiffs. Defendants assert that "[t]he John Does did not commit 'assault' by giving Mr. Flaherty a fair warning about the legal consequences of his continued refusal to leave"; however, the John Does directed the Omaha officer to remove Mr. Flaherty under apparent authority, who had permission to be at the meeting as an invitee, and the Omaha officer subsequently physically removed Mr. Flaherty. (Filing 1, ¶ 30).  The screenshot and video of the arrest shows the two plainclothes security guards grabbing Mr. Flaherty's arm, and the Omaha officer doing the same.[2]

---

[2] https://nlpc.org/?s=berkshire



When Mr. Flaherty was asked to leave, it is unclear whether the Omaha officer was employed by the Omaha Police Department (OPD) or Defendants during this incident. (Filing 1, ¶ 28-30). If employed by OPD, the officer would need to have a reasonable belief that the suspect is committing or has committed a crime under Nebraska law to arrest without a warrant as well as actually hearing the security guard "once more" ask Mr. Flaherty to leave the premises as required by Omaha Police Department Policies. *See State v. Rothenberger*, 294 Neb. 810 (2016). If employed by Defendants, the Omaha officer would be an agent of Defendants and acting on Berkshire's behalf and subject to Berkshire's control. *See Koricic*, 278 Neb. 713. If acting for OPD, the Omaha officer grabbed and removed Flaherty without establishing his or her own reasonable belief for arrest, acting on orders given by the John Does, who in turn were acting on

the orders of  Mr. Buffett . (Filing 1, ¶ 29-30). Thus, regardless of the officer's employment on the day in question, the Omaha officer was acting on behalf of Mr. Buffett and subject to Mr. Buffett's control. *See Koricic*, 278 Neb. at 718. A principal is liable for acts committed by its agent. *Id.* And since an agent's actions are imputed to the principal, the Court can reasonably infer that Defendants can and should be liable for the bodily harm inflicted when the Omaha officer forcibly grabbed Mr. Flaherty's arm and pulled him out of the arena. *See Koricic,* 278 Neb. 713.

The plain clothes security guards and the Omaha officer, whether employed by Defendants or OPD, had the *present and apparent ability* to assault Mr. Flaherty without subjecting Mr. Flaherty to actual injury or contact. (Filing 1, ¶ 28). Any security guard or individual dressed in an OPD uniform has an aura of authority leading an average person to believe they may be subject to contact, especially when those individuals are threatening legal consequences, like criminal trespass. (Filing 1, ¶ 28-30). Therefore, it is reasonable for the Court to infer from the facts Plaintiff pled that the guards and officer could assault Mr. Flaherty without subjecting him to contact.

In sum, the facts combined with any inferences drawn in favor of Mr. Flaherty, allow the Court to reasonably conclude Mr. Flaherty made a claim for assault that should go to the jury to determine whether an assault occurred and Defendants' liability. Even after he was asked to leave the meeting by the security guard, Mr. Flaherty reasonably believed he could remain on the premises because he was unaware his mic had been cut and received a favorable ruling from the Mr. Buffett to continue his presentation. He was not a trespasser. (Filing 1, ¶ 28). He was not tried or convicted of criminal trespassing. The malicious charges were dropped. (*See* Exhibit 1). The request for Mr. Flaherty to leave the meeting was conflicting because Mr. Buffett, as the chair, had stated he could finish his presentation in support of NLPC's shareholder proposal. Plainly stated, Mr. Flaherty was an invitee and a special one at that as opposed to the thousands of other invitees

15

who were mere shareholders. This threat was made in a hostile manner by security guards and an Omaha officer, after which, the Omaha officer grabbed Mr. Flaherty and physically removed him from the meeting. (Filing 1, ¶ 30). And the security guards and Omaha officer maintained an aura of authority, leading to the reasonable conclusion that there was the apparent ability for these individuals to subject Mr. Flaherty to offensive and unconsented physical contact, and Defendants should be liable for such assault.

### ii. Sufficient facts are pled by Mr. Flaherty supporting Count II (Battery).

Plaintiffs sufficiently assert facts supporting their claim for battery, which Defendants assert requires "'[a] harmful contact intentionally done.'" (Filing 21, p. 14 (quoting *Barber v. State*, 316 Neb. 398, 407 (2024)). Plaintiffs have pled sufficient facts, allowing the Court to draw reasonable inferences in favor of Plaintiffs and find that Plaintiffs have pled a claim for battery that a jury can decide after trial that Defendants are liable.

Mr. Flaherty, again, has not been convicted of trespass, and was lawfully on the premises of the Berkshire shareholder meeting. (Filing 1, ¶ 30). The Omaha officer "grabbed Mr. Flaherty by the arm" to remove him from the premises. *Id*. Defendants do not dispute that the Omaha officer "grabbed" Mr. Flaherty. And nothing about this contact was accidental. The Omaha officer "grabbed" Mr. Flaherty with the intent of forcibly removing him from the Shareholders' meeting. *Id*. Mr. Flaherty did not consent to being touched. (Filing 1, ¶ 44-45).   In addition, while removing Mr. Flaherty, he complained to the officer that he was twisting his arm which caused him pain and discomfort only to be told by the officer he would twist it more if Mr. Flaherty did not hurry along. Exhibit 3. 30.  The Omaha officer was instructed by one of the plainclothes security guards to physically take Mr. Flaherty into custody, where he was later handcuffed by other officers at the police station. (Filing 1, ¶ 43). Mr. Flaherty was offended by the Officer's conduct. (Filing 1, ¶ 46;

16

Exhibit 3, ¶30). And any reasonable person would have been offended by the Officer's physical grabbing in this situation. (Filing 1, ¶ 47). In addition, the security guard physically grabbed Mr. Flaherty's right arm in an offensive manner without his consent as the officer grabbed his left arm as shown in the above photo from the video of the incident. These facts sufficiently plead Mr. Flaherty was subject to a harmful contact, intentionally made by the Omaha officer and the security guard, and that Defendants should be jointly and severally liable for such intentional harmful contact.

### iii.   Count III (Intentional Infliction of Emotional Distress) has been sufficiently pled by Mr. Flaherty.

For intentional infliction of emotional distress (hereinafter "IIED"), Defendants describe this claim as a "a high hurdle." (Filing 21, p. 17 (quoting *Richardson v. BNSF Ry. CO.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (internal citations omitted)). This high hurdle requires a Plaintiff to plead "(1) [t]hat there has been intentional or reckless conduct; (2) [t]hat the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community; and (3) [t]hat the conduct caused emotional distress so severe that no reasonable person should be expected to endure it." (Filing 21, p. 17 (quoting *Schieffer v. Cath. Archdiocese of Omaha*, 244 Neb. 715 (1993) (internal citations omitted)). Courts may accept "legal conclusions" or "mere conclusory statements" to conclude a claim has facial plausibility. *Barton*, 820 F.3d at 963-64. It is clear from the Complaint that the facts supporting the distress Mr. Flaherty suffered are sufficiently pled.

The facts pled in paragraphs 49 through 53 of the Complaint are conclusory, as Defendants allege. However, these statements are meant to be conclusions encompassing the facts provided in paragraphs 1 through 31. General practice allows the use of the statement, or something similar

17

to: "[p]laintiffs repeats and alleges each of the allegations in all paragraphs set forth herein," to encompass all previous facts alleged. (Filing 1, ¶ 49). The statement that Mr. Flaherty has suffered "emotional distress," is supported by Mr. Flaherty being "searched, handcuffed, fingerprinted, photographed, and charged" with criminal trespass. (Filing 1, ¶ 31). Moreover, as a professional shareholder activist for the last 19 years who had never been ejected, let alone arrested, in front of thousands of fellow shareholders and which was widely reported in the press, supporting NLPC shareholder proposals for its numerous presentations, some of which were admittedly controversial, these events were emotionally tolling and professionally embarrassing for Mr. Flaherty.  Exhibit 3,¶ 31.  No reasonable invitee should be subject to an arrest when they are invited to such an event after following SEC procedures, especially when the event involves the sometimes-controversial world of business. Additionally, the assault, battery, false imprisonment, and malicious prosecution Mr. Flaherty suffered also contributed to his emotional distress. These are all reasonable inferences the Court can make from the facts pled in the Complaint.

Assault, battery, false imprisonment, and malicious prosecution also require intent, and intent is met here and for all other claims. Allowing plainclothes officers to direct the actions of an Omaha officer is outrageous, especially when their principal had given permission to continue with his remarks after being first interrupted. Officers are allowed to rely on the direction of another officer under the "collective knowledge doctrine"; however, officers must independently verify information provided by a non-officer. *See State v. Wollam*, 280 Neb. 43 (2010). Here, the Omaha officer clearly acted at the direction of the security personnel who were acting under the actual authority of Mr. Buffett and were hired by Berkshire, when they grabbed Mr. Flaherty without independently verifying the security personnel's assertion that Mr. Flaherty must leave the premises as required by Omaha police policy. It is one thing for a speaker who has the floor to be

18

shouted down by attendees as a heckler's veto, and it is quite another for the speaker to be ejected and arrested for continuing his allotted remarks. Instead, Mr. Buffett, as Chair, should have admonished the attendees to be silent and allow Mr. Flaherty to finish the remaining one minute allotted for his presentation as he permitted him to do so just a few minutes before when Ms. Woollums tried to silence him for not staying "on topic."

Mr. Buffett's order that Mr. Flaherty be removed from the arena was apparently triggered when Mr. Flaherty referred to Bill Gates relation with Jeffrey Epstein, which Mr. Buffett regarded as "attacks on an individual," and which allegedly "crossed the boundary". (Exhibit 2, 278: 23-24). But not only did Mr. Flaherty not hear these remarks from Mr. Buffett due to the noise from the heckling audience, he continued his remarks with criticism only of the Gates Foundation as he had been previously allowed to do by Mr. Buffett and not against any "individual." (Exhibit 3, ¶¶ 23-24). As a result of the security guards' conduct, Mr. Flaherty was arrested and held in an office "within the CHI Health Center" for nearly an hour. (Filing 1, ¶ 31). And then he was transported to the Douglas County Corrections Center, "searched, handcuffed, fingerprinted, photographed, and charged" with criminal trespass. (Filing 1, ¶ 31). Mr. Flaherty was "in custody for approximately three hours and was subsequently released after posting bail later that evening around 8:30 p.m. (Filing 1, ¶ 31). This interaction caused Mr. Flaherty a great deal of emotional distress and embarrassment. No reasonable invitee to an annual business meeting, let alone one of the very few who are on the agenda to make a presentation before thousands of other invitees including the press, should be expected to endure the indignation of an illegal arrest, or detention, and be subject to the traumatization of being "searched, handcuffed, fingerprinted, photographed, and [subsequently] charged." (Filing 1, ¶ 31). Indeed, this outrageous conduct by a company

against a shareholder proponent at the company's annual meeting appears to be unprecedented in the annals in the history of annual corporate meetings.

Sufficient facts have been pled to establish that Defendants should be liable for subjecting Mr. Flaherty to the intentional infliction of emotional distress due to the arrest. While some of Plaintiffs' statements may be conclusory, when reasonable inferences are drawn in favor of Plaintiffs, it is reasonably inferred that Defendants acted "willfully, wantonly, maliciously, oppressively, and with conscious disregard," causing Mr. Flaherty's "emotional distress."

### iv.    Mr. Flaherty has pled sufficiently for the Court to reasonably infer Defendants committed Count IV (False Imprisonment).

To arrest an individual based on information from a layperson, officers must make their own independent decision, or reasonable belief, to arrest said individual. *See Rothenberger*, 294 Neb. 810. However, if the officer does not form a reasonable belief that an individual should be arrested, an arrest is unlawful. *Id*. A person is falsely imprisoned when the person is "unlawful[ly] restrain[ed] against his or her will." (Filing 21, p. 12 (quoting *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 118 (2001)). Mr. Flaherty was unlawfully arrested for trespass by an officer who did not form a reasonable belief that he was trespassing

First and foremost, Mr. Flaherty has sufficiently pled facts allowing the Court to reasonably infer that the Omaha officer who arrested Mr. Flaherty did so unlawfully by not forming his own reasonable belief that Mr. Flaherty was trespassing. Rather, this Omaha officer acted on an order given by a plainclothes security guard, or a layperson, acting as an agent for Mr. Buffett. It may be argued that a security guard has more authority to issue an order than a layperson, and that may be true; however, the "collective knowledge doctrine" only applies to information provided by another officer, not information provided by a security guard, and it is clear the Omaha officer did

not independently verify the security guard's information because he did not hear the guard ask Mr. Flaherty "once more" to leave the premises as required by Omaha Police policy. *See Wollam*, 280 Neb. 43. And here, the collective knowledge doctrine would not apply. *See Wollam*, 280 Neb. 43.

Mr. Flaherty was asked to leave; however, he was a special invitee to the Shareholders' meeting, was on the agenda for the meeting, and remained due to the reasonable belief that he could stay on the premises to finish his remarks in support of NLPC's shareholder proposal or at least to stay for the rest of the meeting to hear the remaining shareholder presentations. (Filing 1, ¶ 28). This reasonable belief was formed because he was unaware his mic was cut or that Mr. Buffett asked that he be removed, especially when Mr. Buffett had just previously ruled he could finish his presentation in the remaining minute that he had been allotted. (Filing 1, ¶ 28). Mr. Flaherty told the guard that Mr. Buffett was in charge of the meeting, not the guard and that he would leave when he finished his remarks. (Exhibit 3, ¶ 25). Also, the criminal trespass charges against Mr. Flaherty were ultimately dropped. (Exhibit 1). Defendants claim Mr. Flaherty was "notified by the representative of the [property owner] and by the officer to leave." (Filing 21, p. 13 (quoting *State v. Goering*, No. A-93-1128, 1994 WL 585763 at *5 (Neb. Ct. App. Oct. 25, 1994)). However, the security guards who told Mr. Flaherty to leave and were acting as "representatives" or agents of Mr. Buffett, were in plain clothes, diminishing their authority. (Filing 1, ¶ 30). Mr. Flaherty still reasonably believed he could remain as an invitee, and the Omaha officer who "grabbed" Mr. Flaherty and escorted him to the office in CHI, acted on the plainclothes security guards' direction under apparent authority, instead of establishing his or her own reasonable basis for arrest. (Filing 1, ¶ 29-31). These facts, along with the failure of the security

guard to ask "once more" that Mr. Flaherty leave in the presence of the officer, allow the Court to reasonably conclude that Mr. Flaherty's arrest was *unlawful*.

The Complaint sufficiently alleges that Defendants caused Mr. Flaherty's arrest. Whether the Omaha officer was employed by OPD during the incident or by Defendants, the Omaha officer acted pursuant to orders given by the plainclothes security guards that were employed by Defendants. (Filing 1, ¶ 29-31). As mentioned, the Omaha officer did not establish a reasonable basis for arrest, so the Omaha officer was not acting on authority as an OPD officer or was in violation of OPD Policy for arresting trespassers. Thus, the Omaha officer was acting on behalf of and subject to Mr. Buffett's control, making the Omaha officer an agent of Mr. Buffett. *See Koricic*, 278 Neb. at 718. Since an agent is deemed to be acting on behalf of the principal, it is reasonably inferred that Defendants caused Mr. Flaherty's arrest.

Mr. Flaherty's false imprisonment can be reasonably concluded from the facts pled in the Complaint by the Court. Mr. Flaherty was an invitee and his arrest is categorized as unlawful because the Omaha officer did not gather his or her own independent reasonable belief regarding Mr. Flaherty's alleged trespassing. Instead, the Omaha officer acted as an agent of Mr. Buffett, following the directions of the security guards, and causing Mr. Flaherty's unlawful arrest. *Id*.

> **v.    The demand by the security guard that the Omaha officer arrest and charge Mr. Flaherty for trespass states a claim for Malicious Prosecution (Count V).**

Sufficiently pleading malicious prosecution requires Plaintiffs to plead facts establishing "(1) the commencement or prosecution of the proceeding against him or her; (2) its legal causation by the present defendant; (3) its bona fide termination in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the presence of malice therein; and (6) damages, conforming to legal standards, resulting to the plaintiff." (Filing 21, p. 15 (quoting

*Holmes*, 262 Neb. at 116-17 (2001)). Plaintiff Mr. Flaherty meets all six elements of malicious prosecution.

As mentioned, the security guard "commenced […] the [trespass] proceeding against" Mr. Flaherty by asking the Omaha officer to arrest him. The Omaha officer did in fact arrest Mr. Flaherty pursuant to a demand given by the plainclothes security guard employed by Berkshire. (Filing 1, ¶¶ 29-31; 59-64). Thus, since an agent of Mr. Buffett and Berkshire Hathaway ordered the Omaha officer to arrest Mr. Flaherty, the Omaha officer was acting with apparent authority. *See Koricic*, 278 Neb. at 718. The Omaha officer, acting with apparent authority, was therefore acting on behalf of Defendants and caused Mr. Flaherty's arrest. This arrest subsequently led to the commencement of Mr. Flaherty's criminal charges for trespass. (*See* Filing 1, ¶¶ 31; 59-64). There was an "absence of probable cause" to arrest Mr. Flaherty. The Omaha officer who arrested Mr. Flaherty had not developed an independent reasonable belief that Mr. Flaherty was trespassing, rather he was simply acting on an unjustified demand given by one of the security guards to arrest Mr. Flaherty without hearing the guard "once more" request Mr. Flaherty to leave the premises and Mr. Flaherty refusing. (*See* Filing 1, ¶¶ 29-30). Thus, no probable cause was established by the Omaha officer and rather he or she was acting as an agent and Mr. Buffett was the principal, causing Mr. Flaherty's arrest. *See Koricic*, 278 Neb. at 718. And Mr. Flaherty has incurred damages. He was required to post bail in the amount of $250, and he suffered "physical and mental suffering, distress and humiliation" from his arrest. (Filing 1, ¶¶ 59-64).

Lastly, Plaintiffs plead facts establishing actual malice. Defendants define actual malice as "requir[ing] that the Defendants 'initiated the prosecution for an improper purpose.'" (Filing 21, p. 17 (citing *Acton v. Acton*, No. A-04-147, 2006 WL 908872 (Neb. Ct. App. Apr. 11, 2006)). Plaintiffs were at the Shareholders' meeting presenting on a topic regarding Mr. Buffett's

relationship with Bill Gates and, inadvertently, Jeffrey Epstein.  (Filing 1, ¶¶ 25-27). At the time these connections were mentioned, "Mr. Flaherty's mic went dead, although Mr. Flaherty did not know it at the time," and Mr. Flaherty continued to discuss the topic submitted to and approved by Berkshire for discussion at the meeting. (Filing 1, ¶¶ 14-19).  Approval of the topic is shown by receipt of the email from the Senior Vice President and Chief Financial Officer with instructions for the Shareholders' meeting, and later, the credentials received from Berkshire for the meeting. (Filing 1, ¶¶ 20-21).

It is clear from the topic Mr. Flaherty was discussing and the events that transpired that Defendants did not want Mr. Flaherty on behalf of NLPC to inform the shareholders why it was bad corporate governance to have both the Chairman and CEO hold the same position in a company. Mr. Flaherty was thus removed and arrested for trespass to prevent him from finishing his presentation at the shareholders' meeting that was embarrassing to Mr. Buffett because of his support for the Bill and Melinda Gates Foundation and Mr. Gates's notorious relationship with sex offender Jeffrey Epstein as recently published in the *Wall Street Journal*.[3] Precisely because Mr. Buffett held both positions as Chairman and CEO instead of having those positions held by separate individuals as NLPC advocated in its proposal, the actions and relations of Mr. Buffett with respect to the controversial works of the Gates Foundation and Mr. Gates's relationship with Jeffrey Epstein were all the more associated with Berkshire the company, thus making the company more vulnerable to the reputational damage. Contrary to Defendants' claims, Mr. Flaherty did not engage in "offensive conduct" or violate "basic decorum". (Filing 21, p. 17).

---

[3] See, e.g., Khadeeja Safdar, "*Bill Gates, Leon Black, Thomas Pritzker: One Day in the Life of Jeffrey Epstein,*" Wall St. J. (May 4, 2023).  https://www.wsj.com/business/jeffrey-epstein-calendar-bill-gates-leon-black-thomas-pritzker-62d7590?mod=Searchresults_pos10&page=5

Rather, it was Mr. Flaherty's speech, not conduct, that was apparently offensive to Mr. Buffett, even though such "subjects are fair game" under Berkshire's shareholder meeting policy if they had been made by other attendees during the Q&A session. (Filing 1, ¶27). And "basic decorum" was violated not by Mr. Flaherty, but by the audience who heckled him,

### vi. James "Jamie" Tovar also Experienced Assault (Count VI) and Battery (Count VII) by Defendants.

Again, Defendants argue that assault requires: "facts establishing: 1) 'an attempt [of] force' or 'threats,' 2) 'made in a menacing manner,' 3) 'with intent to inflict bodily injury upon another,' and 4) 'with present apparent ability to give effect to the attempt, without requiring that the one assaulted be subjected to any actual physical injury or contact'"; and battery requires Plaintiffs to plead facts establishing "'[a] harmful contact intentionally done.'" (Filing 21, pp. 10 and 14 (citing *Reavis*, 250 Neb. at 717 (1996)); (quoting *Barber v. State*, 316 Neb. 398, 407 (2024)).

The Complaint sufficiently alleges Mr. Tovar is entitled to relief. Mr. Tovar attended the Shareholders' meeting with Mr. Flaherty, as an NLPC senior staff member and Mr. Flaherty's assistant. (Filing 1, ¶¶ 21, 23). The Complaint states, "Mr. Tovar attempted to follow Mr. Flaherty as he was removed from the arena but was physically prevented from doing so by one of the two unidentified security guards." (Filing 1, ¶ 30). Thus, it is reasonably inferred that Mr. Tovar, as Mr. Flaherty's assistant, was with Mr. Flaherty during the presentation and when Mr. Flaherty was grabbed by the arm and led from the arena by the Omaha officer.

Mr. Tovar was present at the Shareholders' meeting for the same purpose as Mr. Flaherty, as his assistant. (Filing 1, ¶¶ 21, 23, 28-30). When the unidentified security guards and Omaha officer physically removed Mr. Flaherty from the arena, Mr. Tovar was *physically prevented* from following them. (Filing 1, ¶¶ 21, 23, 28-30) when the security guard stood in front of him and

placed his hand on his chest, blocking him from leaving the arena and told to return to his seat. While the physical contact was brief, this fact sufficiently alleges and is reasonably inferred to suggest that Mr. Tovar was the victim of a battery "by one of the two unidentified security guards," acting under the apparent authority of Mr. Buffett. *Id*.

These same facts support Mr. Tovar's assault. Agency principles apply: the Omaha officer and security guards were agents acting on behalf of and subject to Defendants' control, under actual and apparent authority. *See Koricic*, 278 Neb. at 718. Mr. Tovar watched his boss be physically removed from the arena and was physically prevented from following him to see where he was being taken. (Filing 1, ¶¶ 21, 23, 28-30). Security guards and officers exert an aura of authority leading any average and reasonable person to conclude they may be subject to forcible arrest if they do not follow directions. Thus, based on the facts alleged in the Complaint, the Court can reasonably conclude that Mr. Tovar was threatened in a menacing manner with the intent to cause him bodily injury or physical arrest if Mr. Tovar did not follow the security guards' explicit directions. (Filing 1, ¶ 30). Mr. Buffett should therefore be directly liable for the assault and battery committed by his agents against Mr. Tovar.

### vii.    Mr. Tovar was also Falsely Imprisoned (Count VIII) by Defendants.

A person is falsely imprisoned when the person is "unlawful[ly] restrain[ed] against his or her will." (Filing 21, p. 12 (quoting *Holmes*, 262 Neb. at 118). To arrest someone lawfully, an officer must form an independent reasonable belief to arrest said individual, and if such reasonable belief has not been formed, the arrest is unlawful. *See Rothenberger*, 294 Neb. 810; *Holmes*, 262 Neb. at 118.

Sufficient facts have been pled to assert Mr. Tovar was unlawfully restrained. As stated above, "Mr. Tovar attempted to follow Mr. Flaherty as he was removed from the arena but was

physically prevented from doing so by one of the two unidentified security guards." (<u>Filing 1</u>, ¶ 30). Mr. Tovar's "will" can be reasonably inferred as wanting to follow Mr. Flaherty while being unlawfully arrested. (*See* <u>Filing 1</u>, ¶ 30). Further, Mr. Tovar was not under arrest, as shown by the fact that he was not taken with Mr. Flaherty. (*See* <u>Filing 1</u>, ¶ 30). It is thus reasonable for the court to infer that Mr. Tovar was restrained against his will "by one of the two unidentified security guards" from following Mr. Flaherty as he was unlawfully arrested. Moreover, his freedom of movement and his right to leave the arena was prevented by the security guard directing that he return to his seat, with the implied threat that he too may be subjected to arrest. Mr. Buffett should be liable for his agents falsely imprisoning Mr. Tovar.

### viii.    Plaintiffs have pled sufficient facts supporting their claim of Promissory Estoppel (Count IX) against Defendants.

Defendants broke their promise to allow Plaintiffs NLPC and Mr. Flaherty to present their proposal at the Shareholders' meeting. (<u>Filing 1</u>, ¶¶ 28-31, 85-92). Defendants assert: "[p]romissory estoppel is based on a party's detrimental reliance on another party's promise that would otherwise be an unenforceable contract." (<u>Filing 21</u>, p. 23 (quoting *Page v. Siedband*, No. A-19-121, 2023 WL 7499741 (Neb. Ct. App. Nov. 14, 2023)). Sufficiently pleading a promissory estoppel claim under Nebraska law requires a plaintiff to show: "(1) a promise that the promisor should have reasonably expected to induce the plaintiff's action or forbearance, (2) the promise did in fact induce the plaintiff's action or forbearance, and (3) injustice can only be avoided by enforcing the promise." (<u>Filing 21</u>, p. 21 (quoting *Weitz Co., LLC v. Hands, Inc.*, 294 Neb. 215, 226 (2016)).

Plaintiffs assert in the Complaint that "Defendants promised Plaintiffs NLPC and Mr. Flaherty that they would be allowed to present their proposal the Berkshire Hathaway

Shareholders' meeting." (Filing 1, ¶ 86). This promise is illustrated by the fact that Plaintiffs NLPC and Mr. Flaherty's proposal for presentation at the Shareholders' meeting was submitted before the meeting, on May 1, 2023; an email was received from the Senior Vice President and Chief Financial Officer for the proposal proponents of the May 6, 2023 Shareholders' meeting, and the credentials received for admittance to the Shareholders' meeting. (Filing 1, ¶¶ 15-21). Instructions received on May 1, 2023, also stated, "[y]ou will have three minutes to present the proposal. However, we will be somewhat flexible as to time should you run over a minute or so." (Filing 1, ¶ 20).

On receipt of these items, Plaintiffs planned a trip from Virginia to Nebraska for the Shareholders' meeting. (Filing 1, ¶¶ 4-6, 85-92). Traveling to Omaha infers that Plaintiffs would incur travel and lodging expenses. (Filing 1, ¶¶ 85-92). These actions prior to the Shareholders' meeting can be reasonably inferred by the Court to have created a promise upon which Plaintiffs relied. (Filing 1, ¶¶ 85-92). And such promise, to present at the Shareholders' meeting, can be reasonably inferred by the Court to have induced action or forbearance, especially since Plaintiff NLPC's and Mr. Flaherty's principal address is in Virginia, requiring travel to Omaha, Nebraska. (Filing 1, ¶ 85-92).

As a shareholder in Berkshire, Plaintiffs have the right to present NLPC's SEC-sanctioned proposal at the annual Shareholders' meeting. While attendance at that meeting would be required to present a proposal, Defendants' actions prevented Plaintiffs from fully presenting their proposal at the 2023 Shareholders' meeting. On information and belief, never in the history of hundreds of annual meetings and the presentation of shareholder proposals has a proponent's microphone been cut, let alone ejected from the meeting and arrested for trespass. Such injustice can only be remedied by allowing the other Shareholders and audience who would have been present at the

Shareholders' meeting, to hear Plaintiffs' proposal. Remedying the injustice is thus only possible by allowing Plaintiffs to post a copy of Mr. Flaherty's full remarks on Berkshire Hathaway's website for two years, or whatever equitable remedy or relief that this Court would deem just and proper.

## IV.   CONCLUSION

WHEREFORE, Plaintiffs pray Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) be denied because Plaintiffs have sufficiently pled facts establishing that Mr. Buffett and Berkshire Hathaway are plausibly liable on Counts I – IX. If, however, the Court were to grant all or part of the Defendants' motion to dismiss, it should do so without prejudice to afford Plaintiffs an opportunity to file an amended complaint to cure any pleading deficiencies.

Dated this 19th day of August, 2024.

NATIONAL LEGAL AND POLICY CENTER,
PETER T. FLAHERTY, and JAMES "JAMIE" R.
TOVAR, Plaintiffs,

By:   s/ Thomas J. Monaghan
THOMAS J. MONAGHAN, #12874
STUART J. DORNAN, #18553
Attorneys for Plaintiff
Dornan, Troia, Howard, Breitkreutz,
Dahlquist & Klein PC LLO
1403 Farnam Street, Suite 232
Omaha, Nebraska 68102
Telephone: (402) 884-7044
Fax: (402) 884-7045
Email: tom@dltlawyers.com

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this brief complies with the limits imposed by NECvR 7.1(d)(1), in that it contains 9,832 words as totaled by Microsoft Word 2019, which applied the word count function to include all text, including the caption, headings, footnotes, and quotations.

*s/ Thomas J. Monaghan*
THOMAS J. MONAGHAN, #12874

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, I have electronically filed the foregoing document with the Clerk of the District Court using the CM/ECF system which sent notification of such filing to the following:

**Tara A. Stingley,** tstingley@clinewilliams.com
**Isaiah J. Frohling,** ifrohling@clinewilliams.com
Attorneys for Defendants Berkshire Hathaway Inc. and Warren Buffett

**Bryce L. Friedman,** bfriedman@stblaw.com
**Meredith Karp,** Meredith.karp@stblaw.com
Attorneys for Defendants Berkshire Hathaway Inc. and Warren Buffett

and I hereby certify that I have electronically served (via email) the document to the following non CM/ECF participants:

N/A

s/ Thomas J. Monaghan
Thomas J. Monaghan, #12874